223 N.J. Super. 467 (1988)
538 A.2d 1310
HENRY JACKSON, PLAINTIFF-APPELLANT,
v.
CONSOLIDATED RAIL CORP., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1988.
Decided March 10, 1988.
*469 Before Judges J.H. COLEMAN, HAVEY and STERN.
Peter van Schaick argued the cause for appellant (Coyle & Van Dorn, attorneys; Peter van Schaick on the briefs).
Robert H. Bernstein argued the cause for respondent (McCarter & English, attorneys; Richard C. Cooper of counsel and Robert H. Bernstein on the brief).
The opinion of the court was delivered by STERN, J.A.D.
We granted plaintiff leave to appeal from the trial court's order granting a new trial on compensatory damages and denying entry of a judgment for punitive damages. We now hold that the proofs did not warrant the verdict on compensatory damages and affirm the order for new trial. We also conclude that the evidence warranted consideration by the jury *470 of the punitive damage claim. We accordingly remand for a new trial on compensatory damages and for any appropriate post verdict proceedings with respect to the punitive damage verdict.

I
The complaint alleged that plaintiff, a black, 19-year employee of the defendant and its predecessor, had been discriminated against on the basis of "race and national origin in violation of both state and federal constitutional[,] statutory [and] common law." This discrimination was alleged to have resulted ultimately in plaintiff's discharge from the company. According to the complaint, plaintiff "was caused to suffer severe economic injury and hardship, severe emotional distress, both temporary and permanent in nature and was caused to suffer extreme anguish, embarrassment, shame and humiliation." The complaint sought compensatory damages, punitive damages, attorneys' fees, costs of suit and "[w]hatever conditional relief the court deem[ed] equitable and just." The proofs at trial, to be detailed in Point II infra, substantiated plaintiff's claims. At the conclusion of the plaintiff's case, defendant's motion for directed verdict was denied, and plaintiff moved to introduce into evidence defendant's recent financial records in support of his claim for punitive damages. The judge initially ruled that the financial records were not admissible. He concluded that while punitive damages could be recovered in an appropriate case, as a matter of law they were not available to this plaintiff because plaintiff admitted violation of defendant's work rules.
The judge stated:
In the circumstances of this case, we have a situation where the defendant was dismissed, but he admitted that he violated the work rules. He admitted that he lied to the employer regarding the violations during his hearing.
I don't believe that the circumstances of this case show the aggravated malice which would warrant the imposition of punitive damages.
Thereafter, plaintiff suggested that the issue of punitive damages should nevertheless be presented to the jury and a *471 verdict secured to avoid the time and expense of a new trial in the event the court erred in its ruling. After reserving decision while the parties developed their arguments and after two witnesses testified for the defense, the court acquiesced in the suggestion. The judge concluded:
There will be ... no punitive damages even after the jury goes out and makes the determination.
They will not be awarded in the judgment.
But, if on appeal, the Appellate Division finds that punitive damages were appropriate in this case as a matter of law, they find that, then it would not possibly be necessary to have to retry the whole matter again.
They can accept this jury's finding with respect to punitive damages.
I believe that was the whole gist of the discussion, the practical way of handling it to obviate the need for a new trial without prejudicing anybody's rights.
Even if this jury comes back with punitive damages, if we do it that way, they will not be awarded in a verdict, absent a determination that as a matter of law, punitive damages are appropriate.
The defendant perceived the following prejudice:
Because the problem we see is that we don't think punitive damages are something that should be awarded in this case.
That is the reason why we don't think punitive damages should be awarded or the jury should award it respectively.
That is the prejudice under any circumstances.
Thereafter, the following colloquy occurred between the court and defense counsel:
[THE COURT:] They will not be awarded by this Court in this case.
The only reason for following that procedure would be in the event, as a matter of law, the higher Court, the Appellate Division or the Supreme Court, finds that as a matter of law, they should have been considered in this case.
Then, if they find that, they would, at least, have the option of adopting the finding of this jury as to the amount of punitive damages.
Rather than having it sent back and have the whole case decided again solely on the issue of punitive damages, you have to go through this whole thing again.
* * * * * * * *
I'm sure Mr. Bernstein understands what the law is.
If you want some time to think about it, think about it.
If you think there's some prejudice to the defendant in proceeding that way, then let me know what it is.
MR. BERNSTEIN: Very good, your Honor.
*472 Although defendant objected to any consideration of punitive damages, the court and counsel subsequently agreed that the case would be presented to the jury on compensatory damages, after which evidence would be presented on punitive damages and the jury would be charged on that subject. Defendant, over objection to consideration of the issue at all, agreed to the procedure to be utilized to preserve the record without entering judgment. The procedure was outlined as follows:
MR. BERNSTEIN [DEFENSE COUNSEL]: ... I think, just to make sure we're clear on the matter, which we had a discussion about the punitive damages question, maybe you said it, and I didn't catch it; but assuming that the jury were to come back with some award, as I understand what Mr. Van Dorn envisions and as we discussed, I think the thought would be:
There would be a separate charge respecting punitive damages.
Now, the jury could come back with a jury award with respect to punitive damages, assuming we agree on what evidence would even be introduced in that regard, or it comes back with some amount.
That would be struck by you from the record, and then the plaintiff's attorneys, Mr. Van Dorn and Mr. van Schaick, would have the then option of deciding whether they wish to take it upon themselves to appeal that ruling by you, striking from the record punitive damages.
THE COURT: I've already ruled that under the circumstances of this case, I do not believe that punitive damages are appropriate and should be submitted to the jury.
The only reason for this procedure, and I think it's a wise procedure in the interest of both parties and in the interest of conserving time, would be in the event that the Appellate Division or the Supreme Court found that, as a matter of law, the jury should [consider] punitive damages, it would obviate the need for another complete trial if they found that this procedure was proper.
And there was nothing wrong with the verdict returned by the jury, or they would have the option to say this procedure is not proper, and order a new trial anyway.
However, that option would be there.
Judgment would be entered based upon the first verdict returned by the jury.
Punitive damages would not be a part of the final judgment; and that would be the appeal, of course.
MR. VAN DORN [PLAINTIFF'S COUNSEL]: That's my understanding, not that the award would be stricken from the record.
The record will be preserved in the event it's appealed; and the Appellate Division  then they'll have that amount to award, but it will not be part of the judgment.
That, we agree on that.
MR. BERNSTEIN: Okay.

*473 THE COURT: All right.
So that's the procedure we will follow.
There will be no mention of punitive damages or any evidence, the financial evidence, until after the jury returns its verdict as to liability and compensatory damages.
At the end of the case, the judge charged the jury on liability and compensatory damages. During deliberations, the jury submitted the following question to the court:
If we were to award Mr. Jackson mental suffering, anguish, etcetera, would we then additionally have to determine punitive damages against Conrail?
Counsel for both parties agreed that the answer to the question was "yes." The judge responded to the jury's query as follows:
Now, the answer to that is:
Yes.
We will ask you to consider the question, based upon instructions which I will give you; however, in determining the issue of compensatory damages you are now determining, you are to be guided by and follow the instructions I gave you before regarding compensatory damages (sic).
At the conclusion of its deliberations, the jury returned a verdict in plaintiff's favor of $600,000 in compensatory damages. The parties were then permitted to present their case on the punitive damages issue. Thereafter, the trial judge charged the jury on the issue of punitive damages, and the jury retired to deliberate on this issue. When the jury returned, it awarded plaintiff $1,000,000 in punitive damages.
The defendant moved for judgment N.O.V., a new trial, or remittitur. The plaintiff made a cross-motion for reconsideration of the decision made on the punitive damages issue. On May 11, 1987, the judge denied defendant's motion for a new trial as to liability. In reaching this decision, he ruled that "the jury could [reasonably] have arrived at the decision that racial discrimination was a determinant factor" in plaintiff's termination. However, the judge found the jury's award of compensatory damages to be "so disproportionate to the injuries described by the plaintiff as to constitute a manifest injustice and shock the conscience." He noted nevertheless that a jury would be in a "better position" than the court to assess damages in a case of this type. He therefore ordered a new trial on *474 the issue of compensatory damages, and denied the motion for remittitur. The judge also denied plaintiff's motion for reconsideration of the punitive damages issue.
We granted plaintiff's motion for leave to appeal. Defendant did not seek leave to cross-appeal.

II
The facts developed at trial reveal egregious racial prejudice.
Plaintiff became an employee of defendant (hereinafter defendant or Conrail) on April 1, 1976.[1] Plaintiff worked for Conrail for 17 years without any major incidents of alleged racial discrimination. However, plaintiff's troubles began when he bid for a promotion to the position of foreman in June 1979.
Plaintiff noted that he applied for the foreman's job three times before he received it. He claims that the first two times that he bid, the job was cancelled without explanation, presumably because he had applied for it. According to plaintiff, "[a] job which normally took less than [25] days to get took over [100] days in [his] case." Defendant offered no evidence to dispute these facts.
After nine months on the job as a foreman, while plaintiff was away on vacation, plaintiff's "work gang" was reorganized without his knowledge. The gang was "divided" into passenger and freight crews. The dozen men that plaintiff had supervised were assigned to the passenger crew, with a white man having less seniority than plaintiff temporarily assigned as its supervisor. Plaintiff was assigned to the "freight side" as foreman but without any men to supervise. When he returned *475 from his vacation, he voiced objection to the reorganization. His supervisor told him that if he wanted the position as supervisor of the passenger side, he would have to bid for it. As a result of plaintiff's protest, defendant opened the job for bidding. However, plaintiff's bid was not accepted, although the current supervisor's one month temporary assignment period had elapsed. In an attempt to regain his position, plaintiff then filed a complaint with the EEOC.
Plaintiff alleges that during the pendency of his claim with the EEOC, "a hangman's noose ominously appeared" on defendant's premises. A photograph taken by plaintiff depicts the noose as it was hung over a girder that was adjacent to one of the gang's worksheds or shanties. In addition, according to plaintiff, the insignia "KKK" had been scratched into a girder attached to the structure supporting the noose. The noose wasn't removed for a week even though it was located near a workshed adjacent to a walkway frequented by defendant's supervisory officers, approximately 1/4 mile from the nearest public access. During the same period, plaintiff two or three times found his tires spiked flat with nails. Eventually, plaintiff was restored to his position as supervisor of the work gang.
In late 1981, plaintiff was transferred from Conrail's Hoboken plant to its work yard in Elizabeth. Plaintiff testified that he encountered more racial discrimination at the new location. There was testimony through another Conrail employee that plaintiff's "supervisory personnel ... referr[ed] to Henry Jackson as a `F'ing nigger,' and they expressed emphatic desire to get rid of him." There was also evidence that plaintiff's crew was assigned the most difficult jobs, was sent out in adverse weather conditions on routine, non-emergent jobs, and that he was given the most troublesome crew members whom no one else wanted.
The purported reason for plaintiff's termination was an incident which occurred on January 15, 1982. When plaintiff's crew had finished work for that day, members stopped to pick *476 up some beer for the ride home. Plaintiff, who has diabetes, does not drink. However, at the request of two crew members, plaintiff permitted the drinking that day. According to plaintiff, he allowed the drinking on this one occasion because it was the last day the crew would work together before some of its members were laid off. However, plaintiff and his crew had been under the surveillance of the Conrail Police during this time. When they were observed purchasing the beer, Conrail supervisors were called to the scene. Plaintiff was accused of having participated in the drinking, and he was terminated after a hearing on the charges. Defendant, however, asserts that the reason for plaintiff's termination was his failure, as supervisor, to prevent his crew members from consuming alcohol. According to defendant:
No evidence was presented at trial which linked these earlier events to Jackson's dismissal in 1982 based on an admitted rule violation concerning possession of alcohol. There was no testimony that any Conrail supervisor was even aware of the EEOC filing. Jackson conceded he did not possess any knowledge of the person responsible for hanging the noose or inscribing the `KKK', although he acknowledged that he had been told a subordinate was responsible. Jackson testified that the noose was not located on Conrail property, that he had no knowledge that it was directed at him and that it did not `bother him'. In fact, Jackson did not report the existence of the noose to any member of Conrail Management, complain about it to anyone or grieve it. The same is true of the alleged tire-spiking incident. As noted, the incidents occurred while Jackson was working in Conrail's Hoboken Division, a separate and distinct division from Conrail's New Jersey Division where [supervisors] Colantuono and Acrea worked. The record does not contain any evidence of racial animus by any Conrail supervisory employee while he worked in Hoboken. In short, there was no testimony whatsoever relating these events to Jackson's discharge. [footnotes omitted].
After approximately eight months plaintiff was reinstated to his position with the company. However, he did suffer a loss of $16,500 in lost wages during the period of his unemployment. At trial, plaintiff offered the testimony of Dr. Mark Seglin as evidence of the emotional distress suffered as a result of these collective incidents. Dr. Seglin, a Rutgers professor and clinical psychologist, who had seen plaintiff only twice for two hours each time, and not until five years after his termination, concluded that plaintiff suffered from an "obsessive personality *477 disorder" or "concomitant dysthymic mood disorder" caused by depression over the discharge. Dr. Seglin testified that plaintiff had been depressed and had suffered permanent psychological damage. However, he did feel that plaintiff could be helped by extensive counseling, which, in his estimate, would cost somewhere between $8,000 and $15,000.
Plaintiff's wife testified that she had been away caring for her invalid mother during the discharge period. She was therefore not available to lend support to her husband, who did not confide in her about his problems because he didn't want to burden her.

III
In ruling on the motion for a new trial or judgment N.O.V., the trial judge noted that plaintiff "had the obligation of proving by a fair preponderance of the credible evidence that race was a determinant factor in his firing, and that a racial reason more likely than not motivated this firing." He stated, "while the rule violation is the outward reason for his dismissal, [plaintiff proved that] the underlying determinant factor was the racially discriminatory action of his immediate supervisor."
He concluded that:
Based on this evidence that was before them and giving the benefit of all inferences which could reasonably and legitimately be deduced therefrom, the jury could have arrived at the decision that racial discrimination was a determinant factor.
It could not be found that a decision was a result of error or mistake; therefore, the motion for a new trial on that ground will notwithstanding [sic] the verdict, be denied.
Accordingly, he denied the motion for new trial as to liability. With respect to damages the court reviewed the evidence and judgments in other cases, some emanating from the Division on Civil Rights as opposed to the Law Division. The court found plaintiff's case to be credible and stated:
First we must look to the testimony of the plaintiff himself. I find that Mr. Jackson was forthright in his testimony on the stand, forthright in his description of what happened to him and how he felt about it.
First and foremost, he lost eight months work and wages, which there was no dispute, which was $16,500.

*478 As to his feelings of emotional distress and humiliation, Mr. Jackson felt or testified that ordinarily racial references did not bother him; he was able to handle it.
However, he testified that when he was discharged from his job, he was ashamed and he was upset; he was ashamed of being accused of drinking. I believe that he said his wife was very much opposed to drinking, that he had given up drinking and had not taken a drink for many years.
He stated that he was upset over having lost his job, that he felt anxiety in that he would not be able to find suitable employment at which time he became depressed.
I believe his words were to the effect that he was 52 years old and how he was out of work and had worked all of his life. He made efforts during the time he was out of work with Union representatives and others to try to get reinstated to his job, and after eight months working through this process, his job was restored to him.
During that time or after, he did not seek any psychological help.
There was testimony then from Dr. Seglin, a clinical psychologist at [Rutgers], that he was consulted by Mr. Jackson approximately one month or so before the trial began, some five years after the occurrence. He saw him on two occasions at two hour sessions with him.
He stated that from his session with Mr. Jackson, he determined that Mr. Jackson was depressed after the discharge; I believe he called it psychosygenic depression, that he was humiliated and fearful that he would not find suitable new employment, that lack of work was a blow to his self-worth.
He further testified that he continues to suffer from obsessive personality disorder and a mood disorder which is sense of vulnerability.
It was his opinion that there would be some lasting scars, that he would never be quite the same again. It's hard to say whether the depression would last or how long it would last depending on future events.
In his opinion, there is a need of future [psyc]hological counselling.
There was no testimony of any outward manifestation of humiliation and depression distress experienced by the plaintiff other than that which was experienced during the eight-month period that he was out of work.
Given the economic loss, the trial judge concluded that the jury must have awarded over $500,000 for emotional distress. However, he concluded that, notwithstanding that the emotional distress, especially during the period of discharge, "was real and painful and there are some resulting emotional scars ..., the severity of the distress from the testimony of the plaintiff himself was not of such a degree to warrant the judgment of over half a million dollars." He also concluded:
The award is so disproportionate to the injuries described by the plaintiff as to constitute a manifest injustice and shock the conscience. It's somewhat difficult to balance the shock of the conscience here over the conscience at the conduct of Mr. Colantuano [plaintiff's supervisor in Elizabeth].
*479 The judge indicated that there was an issue by virtue of the jury's question during deliberations as to whether "it wanted to punish the defendant, which eventually they did, even though they had not been charged to consider punitive damages." He further stated that "[t]hat passion may have remained with it even when it went back to consider the question of compensatory damages alone." Accordingly, he felt that relief from the compensatory damages award was proper, but that because a jury "would be in a better position than the Court in this case to assess a proper and just measure of damages for the plaintiff's losses, his humiliation and emotional distress," a new trial was required.
With respect to reconsideration of the issue of punitive damages, the judge stated:
In the plaintiff's case, there was sufficient evidence for the jury to find discrimination by the certain supervisory personnel, Mr. Colantuano, and/or based upon the testimony of Fagen, Bugel; both of whom had previously filed false affidavits with the Court, one [of] whom had even repudiated his damaging testimony at trial.
The defendant seeks a reconsideration because of the testimony of the defendant's witnesses, particularly Colantuano who had various memory losses as to various questions.
Certainly, there was evidence that Colantuano may have had a personal motive in that Mr. Jackson bumped a friend of his, as he was entitled to do, in obtaining the supervisory job based upon seniority and the Union contract which was the way of life in the work force, requiring Colantuano's friend to move to another job in Perth Amboy.
Under the circumstances that Mr. Fagen overheard Colantuano and his friend talk about how they would like to get rid of Mr. Jackson; but from the plaintiff's testimony, the company also had a sufficient work-related reason for taking disciplinary action, sufficient nondiscriminatory grounds in that there was a recognized violation of the work rule and as a supervisor, Mr. Jackson did not take action to reporting it, and in fact did it to protect his men.
Therefore, the motion to reconsider at this time the punitive damage claim will be denied.
In Baxter v. Fairmont Food Co., 74 N.J. 588 (1977), the Supreme Court set forth standards for our review of post-verdict applications for relief from verdicts claimed to be excessive in civil cases. There, the trial judge denied a new trial but granted a remittitur. On appeal, we vacated the remittitur and reinstated the jury's verdict, and the Supreme Court affirmed. *480 The Court made clear "that a trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and resulting disability shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust." Id. at 596 (citations omitted). "It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted." Id. at 598.
To us all of this means that a trial judge, before acting in derogation of the jury's fixing of damages, must be convinced, and that very clearly, of something like this: `This verdict is terribly wrong  having canvassed the record I reach this conclusion because of substantive factors in [the] totality of the evidence [[given specific reasons based on the evidence]]  and I must therefore determine that it is so much against the weight of the evidence as to be, manifestly, a miscarriage of justice.' [Id. at 598-599 (bracketed material in lieu of bracketed material by court)].
See also Carrino v. Novotny, 78 N.J. 355, 360-361 (1979); Sweeney v. Pruyne, 67 N.J. 314 (1975); Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227 (1971) (remittitur standard); Dolson v. Anastasia, 55 N.J. 2 (1969) (new trial standard); Henker v. Preybylowski, 216 N.J. Super. 513 (App.Div. 1987) (remittitur not substitute for new trial when verdict is the product of prejudice, partiality or passion); R. 4:49-1(a).
Baxter also addressed our scope of review:
The trial judge having acted and that action coming on for review on appeal, we think the appellate court must be concerned with the same norm of decision, since that is basic to its ultimate conclusion as to whether justice has miscarried by dint of the trial judge's invasion of the jury's province, where he was not justified in doing so. [74 N.J. at 599].
However,
It must be acknowledged, to be sure, that the trial judge has one advantage over the appellate court. That court depends upon the cold record, whereas he has also what is called the `feel of the case.' Fritsche v. Westinghouse Electric Corp. [55 N.J. 322 (1970)], supra; Dolson v. Anastasia, supra. But where the record is extensive and plaintiff's evidence largely uncontradicted, where no exaggeration or malingering is apparent, mentioned or implied in that record, where no countervailing medical evidence was offered by defendant, as here, the `feel of the case' factor is minimal. [Id. at 600].
Hence, as Justice Hall stated for the Supreme Court in Dolson v. Anastasia, supra, where the trial court's denial of a new trial was reversed by the Supreme Court:

*481 The standard governing an appellate tribunal's review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge. We say the test is `essentially the same', because where certain aspects are important  witness credibility, `demeanor', `feel of the case', or other criteria which are not transmitted by the written record , the appellate court must give deference to the views of the trial judge thereon. His decision, however, is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court. [55 N.J. at 7].
See also Rivera v. Westinghouse Elevator Co., 209 N.J. Super. 543, 548 (App.Div. 1986), mod. on other grounds 107 N.J. 256, 259 (1987).
Here, the judge found the plaintiff to be credible, but his economic loss was only $16,500. He underwent no psychiatric or psychological treatment and he accepted re-employment with defendant approximately eight months after discharge and five years before trial. His expert testified that he should obtain counselling at an estimated cost of between $8000 and $15000.
While there was clearly compensable emotional distress, Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 409-416 (1973), we are satisfied  based on our independent evaluation of what can be transmitted by the written record (or lack of it) and from the judge's evaluation based on his feel of the case  that the new trial was not improperly granted. Cf. Henker v. Preybylowski, supra. Although not without some difficulty because the jury in response to a question was instructed not to consider punitive damages while deliberating on compensatory damages, that conclusion is supported by the trial judge's own conclusion that the jury may well have "penalized" defendant when considering compensatory damages prior to receiving the case on punitive damages.

IV
The trial judge's determination not to enter judgment for punitive damages was apparently based on his conclusion that *482 defendant's conduct was premised at least in part on plaintiff's violation of the work rules by failing to properly prevent his subordinates from drinking beer while on the job. This conclusion, however, was inconsistent with his conclusion that the jury's verdict on liability was unimpeachable and properly premised on a finding that plaintiff's discharge was racially motivated. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Andersen v. Exxon Co., 89 N.J. 483, 492-493 (1982). He indicated that punitive damages were awardable where the proofs warranted it in an appropriate action under the Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and we agree with that legal principle.
This suit was premised on wrongful discharge under the state and federal Constitutions as well as the Law Against Discrimination, and punitive damages may be awarded where appropriate for improper discharge in violation of the constitution. They may also be awarded for improperly motivated policy reasons, see Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980), or for violation of an individual's federal civil rights, Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Gordon v. Norman, 788 F.2d 1194 (6th Cir.1986), each theory having been asserted by the plaintiff here. Moreover, the Law Against Discrimination was enacted to supplement the existing state law in the area of civil rights. See Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 300 (Ch. Div. 1970).[2]N.J.S.A. 10:5-27 expressly provides:
Nothing contained in [the Law] shall be deemed to repeal any ... law of this State relating to discrimination because of race, creed, color, national origin, ancestry, marital status or sex or liability for service in the Armed Forces of the United States; except that, as to practices and acts declared unlawful by section 11 of this act, the procedure herein provided shall, while pending, be exclusive; and the final determination therein shall exclude any other action, *483 civil or criminal, based on the same grievance of the individual concerned. Nothing herein contained shall bar, exclude, or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination. [footnote omitted].
The statute embodies the "strong public policy of New Jersey against employment discrimination." Andersen v. Exxon Co., supra, 89 N.J. at 492; See also Peper v. Princeton University Bd. of Trustees, 77 N.J. 55, 80 (1978). Furthermore, the standard for establishing unlawful discrimination under the common law and the statute is the same, Id. at 83; see also Andersen v. Exxon Co., supra, 89 N.J. at 492-493, and punitive damages may be awarded independent of the statute.
To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another. DiGiovanni v. Pessel, supra, 55 N.J. [188] at 191. In Berg v. Reaction Motors Div., supra, 37 N.J. [396] at 414, [our Supreme] Court said:
Professor McCormick suggests that in order to satisfy the requirement of willfulness or wantonness there must be a `positive element of conscious wrongdoing.' See McCormick, supra, at p. 280. Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences. [Citations omitted].
The key to the right to punitive damages is the wrongfulness of the intentional act. `The right to award exemplary damages primarily rests upon the single ground  wrongful motive * * *.' Dreimuller v. Rogow, supra, 93 N.J.L. [1] at 3; see also Trainer v. Wolff, 58 N.J.L. 381 (E. & A. 1895). [Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984)].
Based on the egregious conduct of defendant as acknowledged by the trial judge in denying the motion for new trial as to liability, we conclude that the issue of punitive damages should have been presented to the jury.[3]

V
Defendant did not seek review by us of the decision to present the question of punitive damages to the jury after the *484 claim had been dismissed, nor did he seek leave to cross-appeal from the procedure utilized. At oral argument before us, defendant candidly admitted the absence of prejudice by virtue of the bifurcated presentation. Moreover, "punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss, or detriment to the plaintiff has occurred." Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra, at 51. Therefore, we decline to decide whether the procedural irregularity flowing from presentation of the punitive damage claim to the jury following its dismissal warrants a new trial as to punitive damages.[4] That issue must be advanced in the first instance by way of motion for new trial to the trial judge.
The only issue before us regarding punitive damages results from plaintiff's challenge to the judge's refusal to enter judgment based on his determination as a matter of law. Even in the absence of any application of defendant or any cross appeal, however, we cannot direct entry of judgment on the punitive judgment award, particularly in light of the unusual *485 procedural aspects of this case. Defendant should still have an opportunity to address motions to the verdict for punitive damages. As we have concluded only that there was a legal basis for the award, defendant should not be denied the opportunity to attack the verdict by motions otherwise available had the court not simultaneously dismissed and presented the claim.[5] Defendant's brief defends the dismissal on legal grounds we have rejected in this opinion, and defendant should be permitted to address any other ground for attack on the punitive damage award as excessive or improper in traditional post verdict motions which may be filed on remand.
Accordingly, the order granting new trial on compensatory damages is affirmed, the order denying entry of the punitive damage verdict as a matter of law is reversed, and the matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] According to Conrail:

On January 2, 1974, the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq., was enacted. Pursuant to the Act's terms, Conrail was created to acquire the properties of six (6) bankrupt railroads and provide essential rail service to the midwest and northeast regions of the United States. As an employee of a predecessor railroad, the Central Railroad of New Jersey, plaintiff became employed by Conrail.
[2] Although punitive damages were denied in Serruto, the decision was based on the proofs and because this was not an "exceptional case." See 110 N.J. Super. at 319.
[3] An award of punitive damages could ultimately be passed on to consumers of the railroad by virtue of its impact on the rate base determination. Although not raised on this appeal, we note that Conrail is not a "public entity" for purposes of the Tort Claims Act, see N.J.S.A. 59:1-3; Vacirca v. Consolidated Rail Corp., 192 N.J. Super. 412 (Law Div. 1983), and that the bar to punitive damages in N.J.S.A. 59:9-2c is therefore not applicable. In Daaleman v. Elizabethtown Gas Co., 150 N.J. Super. 78, 85 (App.Div. 1977), rev'd other grounds, 77 N.J. 267, 273 (1978) we suggested that the award of damages could be "molded so as to avoid" any pass through "on to the consumers by increased rates charged to them." 150 N.J. Super. at 85. However, we don't perceive the suggestion viable when dealing with a public entity and believe that an immunity may be created only by statute.
[4] The trial judge could have reserved judgment and at the end of all the evidence, submitted the issue to the jury, and thereafter entered judgment for defendant on the punitive damage claim. R. 4:40-2. Having dismissed the claim, he should not have presented it to the jury in the absence of defendant's acquiescence. Moreover, separate consideration of damage claims are generally improper. The claims should have been presented jointly with the use of separate verdicts. See R. 4:39-1. See also Nylander v. Rogers, 41 N.J. 236, 240-241 (1963).
[5] Defendant also attacks the punitive damage verdict because the court in its charge did not place the burden on plaintiff to prove same by "clear and convincing" evidence. However, that is not the present standard applicable in New Jersey. See Fischer v. Johns-Manville Corp., 103 N.J. 643, 672-674 (1986). Compare, Texas Dept. of Community Affairs v. Burdine, supra, (Title VII discrimination case).