227 N.J. Super. 78 (1988)
545 A.2d 812
JOHN ERICKSON, PLAINTIFF-RESPONDENT,
v.
MARSH & MC LENNAN CO., INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1988.
Decided August 3, 1988.
*80 Before Judges PRESSLER, MUIR, Jr., and SKILLMAN.
Cynthia M. Jacob and Michael F. Rosenblum, pro hac vice, argued the cause for appellant (Collier, Jacob & Sweet, attorneys; Patrick T. Collins and Patricia E. Willard of Norris, McLaughlin & Marcus, former attorneys for appellant, on the brief).
Luanne M. Peterpaul argued the cause for respondent (Critchley & Roche, attorneys; Alan L. Zegas, of counsel; Michael Critchley and Alan L. Zegas on the brief).
The opinion of the Court was delivered by MUIR, Jr., J.A.D.
Plaintiff, a former employee of defendant, brought this action alleging wrongful discharge, sex discrimination under N.J.S.A. 10:5-12 and libel. He sought compensatory and punitive damages. Following a nine-day trial, a jury awarded him $250,000 in compensatory and $750,000 in punitive damages. Defendant appeals.
The consequential issues raised by the appeal are (1) whether the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. *81 10:5-1 et seq., precludes common law redress for wrongful discharge based on sex-discrimination and (2) whether plaintiff failed to prove that defendant's conduct constituted actionable sex-discrimination and libel.
Defendant, a casualty insurance brokerage firm, hired plaintiff in November 1981 as an account representative for the major accounts casualty department in its Morristown office. In May 1982, plaintiff was transferred to an account executive position in the commercial accounts department. The transfer occurred, according to James Bonica, plaintiff's original supervisor, due to plaintiff's inability to perform his job requirements as an account representative. Bonica and other executives of defendant testified the transfer was not a promotion since no raise was involved and since plaintiff left defendant's largest and most prestigious department. Plaintiff, nevertheless, testified the transfer was a promotion, basing his opinion on the fact that his job description category was a higher ranking.
In the commercial accounts department, plaintiff headed a group consisting of an account representative, Karen Neidhammer, and an insurance assistant, Stuart Torbert. Plaintiff's immediate supervisor was Angela Kyte while Frank Hayes was her supervisor.
On February 8, 1983, Neidhammer, in the presence of a fellow employee, Kelly Lennan, told Kyte she had been sexually harassed by plaintiff on three separate occasions. Kyte reduced Neidhammer's accusations to writing. Kyte took no immediate action although she believed Neidhammer. Three days later, a heavy snowstorm caused the closing of defendant's Morristown office around 3 p.m. Several of defendant's employees, including Hayes, Lennan and Neidhammer, went to a local restaurant for drinks. Sometime after 8 p.m., Neidhammer and Lennan, who was staying with Neidhammer while Neidhammer's husband was out of town, left the restaurant. Lennan could not extricate her car from the snow so Hayes drove the women home. Due to bad road conditions, Hayes *82 stayed overnight at Neidhammer's home. The three slept in separate rooms.
On February 14, Hayes informed Kyte that Neidhammer had reluctantly told him about the sexual harassment. Hayes contacted the managing director of defendant's New Jersey division, Roger Egan, who referred Hayes to the New York Personnel Office for advice. A personnel officer told Hayes "to do something fast and either fire or give a threat of firing if actions continue." The officer also directed Hayes to have Kyte conduct a personnel survey concerning any other inappropriate conduct. Kyte spoke to other women in the department without mentioning any names. Two women said plaintiff had made either improper gestures or comments to them.
On February 15, 1983, Kyte held a meeting with plaintiff to discuss Neidhammer's charges. Kyte testified plaintiff admitted the incidents but indicated they had been meant as jokes. Kyte gave plaintiff a cease and desist admonition. She embodied a resume of the meeting and her instructions in a handwritten memo to the plaintiff noting "whether joking or not," "I have expressly instructed you to stop."
In March, plaintiff, who claimed he denied the sexual harassment charges from the inception, retained an attorney. The attorney sought a meeting with Kyte and a confrontation with Neidhammer. Frank Cooper, manager of defendant's employer relations department, wrote counsel and advised him the matter was closed so long as plaintiff abided by Kyte's instructions. Cooper refused counsel's request to confront Neidhammer on grounds it "would be disruptive to the working environment."
In May 1983, plaintiff came up for evaluation in accord with company policy. Kyte's extensive formal evaluation criticized plaintiff's work performance but did not recommend discharge. Kyte testified she discussed her evaluation with plaintiff, but he refused to accept her "constructive criticism." Plaintiff countered Kyte's evaluation with a letter in which he contended the alleged deficiencies were never brought to his attention. In *83 the letter, he also contended he was being treated unfairly because he had contacted an attorney to respond to the sexual harassment allegation. Kyte testified that prior to the written evaluation, she had discussed with plaintiff some of the deficiencies covered by the evaluation. Egan testified that a report prepared by plaintiff for a client had been so inferior that it was thrown in the basket and done anew by Kyte. Egan concluded plaintiff knew of the incident either through Kyte or from the fact that plaintiff would have seen the new report when later dealing with the client.
Plaintiff's reaction to Kyte's evaluation led her to recommend to Hayes that plaintiff be fired. Based on Kyte's recommendation, comments by Egan and Bonica and his own observations of plaintiff's work performance, Hayes fired plaintiff on May 20, 1983.
Plaintiff testified he began looking for employment right after he was fired. Two potential employers contacted Kyte for references. Both written responses by Kyte stated "[plaintiff] left our operation because his level of expertise and areas of interest in insurance did not match the depth required for the proper service of Marsh & McLennan clients." The letters also contained positive information about plaintiff. He did not secure a job with either of the prospective employers. However, in August 1983, he accepted employment with an insurance agency where he was employed at time of trial.
Shortly after gaining employment, he filed the complaint in this case. The theory underlying his claim of sex discrimination was that his supervisors conspired together to trump up sexual harassment charges so he could be fired and Neidhammer promoted to take his place. He contended Hayes had amorous relations with Neidhammer and other women in the commercial accounts department and that Hayes' consequent motivation was to replace him with Neidhammer. He pointed to the discharge of his insurance assistant Torbert, something plaintiff apparently did not contest, as an example of the *84 motivation of Hayes to replace male employees with women Hayes favored. Testimony indicated Hayes was romantically linked with Torbert's replacement and that Hayes, who had the authority to discharge Kyte, consulted with Kyte when she discharged Torbert. We note Neidhammer did not replace plaintiff.

I.
We turn first to the issue of whether the NJLAD preempts a common law claim of wrongful discharge on sex discrimination grounds. We conclude that it does not.
Under the decisional law of this State, an at-will-employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72 (1980). New Jersey has a strong public policy designed to eradicate the cancer of unlawful discrimination. Peper v. Princeton University Board of Trustees, 77 N.J. 55, 80 (1978); Jackson v. Concord Company, 54 N.J. 113, 123 (1969). The policy emanates not only from legislation but from fundamental guarantees of our Constitution. N.J.S.A. 10:5-1 et seq.; Peper v. Princeton University Board of Trustees, supra, 77 N.J. at 79-80.
Redress for violations of that public policy are not limited to the administrative and penal remedies of the NJLAD. The act authorizes private complaints in the Superior Court for redress under its provisions, N.J.S.A. 10:5-13; it does not foreclose judicial enforcement of independent rights of redress. N.J.S.A. 10:5-27. Independent rights exist under our common law. See Peper v. Princeton Board of Trustees, supra, 77 N.J. at 79-80. The NJLAD supplemented existing law in the area of civil rights; it did not supplant it. Jackson v. Consolidated Rail Corp., 223 N.J. Super. 467, 482-483 (App.Div. 1988). Its supplemental prescription of administrative and penal remedies does not foreclose the independent right of judicial action for both *85 compensatory and punitive damages. These latter, more expansive remedies sustain recognition of private interest redress for the wrongful and tortious character of illegal discrimination. Lally v. Copygraphics, 85 N.J. 668, 670-672 (1981).

II.
Defendant challenges the sufficiency of the proofs on plaintiff's wrongful discharge-sex discrimination claim.[1] It contends the trial judge should have granted its motion for judgment notwithstanding the verdict. We begin our assessment of these contentions with a review of the applicable principles of law.
In Peper v. Princeton University Board of Trustees, supra, 77 N.J. at 81-84 and Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 30-32 (1981), our Supreme Court adopted the methodology of McDonnel Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as the starting point for proving an illegal discrimination case under the NJLAD. See also Clowes v. Terminix Intern., Inc., 109 N.J. 575, 595 (1988); Andersen v. Exxon Co., 89 N.J. 483, 492 (1982). As the Andersen court noted:
The McDonnell Douglas approach established the elements of a prima facie case of unlawful discrimination. The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677 (footnote omitted). Establishment of the prima facie case gives rise to a presumption that the employer unlawfully discriminated against the applicant. The burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the employee's rejection. Goodman, supra, 86 N.J. at 31; Peper, supra, 77 N.J. at 83. The plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory *86 reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination. Goodman, supra, 86 N.J. at 32. In such cases the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff; only the burden of going forward shifts. Ibid. [Id. at 492-493].
Additionally, once the employer presents evidence of a legitimate, nondiscriminatory reason, the presumption is no longer relevant and the trier of the fact must decide whether plaintiff has proved intentional discrimination. U.S. Postal Service Bd. of Govs. v. Aikens, 460 U.S. 711, 713-716, 103 S.Ct. 1478, 1480-1482, 75 L.Ed.2d 403 (1983).
McDonnell Douglas enunciated a method of proof for disparate treatment claims based on comparative evidence. In prescribing the prima facie case criteria, the Court gave recognition to the fact that proof of unlawful discrimination rarely can be demonstrated through direct evidence but normally is demonstrated only through circumstantial evidence. It did not make plaintiff's burden in meeting those criteria onerous. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215 (1981). The prima facie criteria eliminate most nondiscriminatory reasons for plaintiff's rejection and raise an inference of discrimination only because is it presumed the conduct identified in the four-part test, if otherwise unexplained, is more likely than not based on the consideration of impermissible factors. Id. at 253-254, 101 S.Ct. at 1093-1094, 67 L.Ed.2d at 215-216.
However, the criteria are not immutable. See Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977); Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 382-383 (1988); Clowes v. Terminix Intern., Inc., supra, 109 N.J. at 596. They require modification in a discriminatory discharge case. The Clowes court, quoting from Loeb v. Textron, Inc., 600 F.2d 1003, 1013-1014 (1 Cir.1979), found the appropriate modification to be:
`[1] that [plaintiff] was in the protected ... group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he *87 nevertheless was fired, and [4] that the employer sought someone to perform the same work after he left.' [109 N.J. at 597].
The Loeb court, in adopting the criteria, identified the last criterion by the more expansive requirement "that his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills." Loeb v. Textron, Inc., supra, at 1013.
Neither Loeb, Jansen nor Clowes dealt with an allegation of intentional sex discrimination against a white male who, in a conventional corporate structure, as here, is a member of a majority class. When such an allegation is made, modifications are required. While the NJLAD prohibits discrimination against either sex, a white-male-majority plaintiff who asserts sex discrimination in employment bears the burden of demonstrating he was intentionally discriminated against despite his majority status. See Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6 Cir.1985). Thus, he must substantiate, as part of the initial prong, that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id. Conjointly, to satisfy the fourth prong, plaintiff must establish his former employer dismissed him in order to give preference to a woman of equal or lesser qualifications.[2]
Applying the modified test, we conclude plaintiff failed to meet the first and fourth criteria. He proffered no evidence from which it can be inferred defendant was an employer who discriminated against males. Indeed, given the number of male supervisors identified in the record, the evidence suggests to the contrary. Additionally, plaintiff proffered no evidence relating to the course of action defendant followed concerning plaintiff's vacancy. The record fails to disclose whether defendant sought equally qualified women to replace him. It also *88 fails to disclose whether defendant replaced plaintiff with a woman of equal qualifications to perform the same work. In fact, it fails to disclose who, if anyone, actually replaced plaintiff. The limited proofs elicited show that at the time of his employment there were three account executives: plaintiff, Karla Smith and Barbara Dunster. As to the events following plaintiff's discharge, the record discloses only that at the time of trial there were four account executives: Karla Smith, Barbara Dunster, Gale Smith and Cheryl Vandermosten. While the department may have had no male account executive after plaintiff left, plaintiff's proof, given its favorable inferences, nevertheless fails to demonstrate who defendant sought to replace plaintiff and which, if any, of the current account executives took plaintiff's place to do the same work. There is no proof as to the responsibilities of any of the account executives. Furthermore, there is no proof of the qualifications of any account executive. The lack of such proof precludes the required prima facie showing.
Moreover, plaintiff's proof simply did not create inferences of the illegal animus required. He premised his claim on the reasoning (1) that he was discharged to provide a job for Neidhammer based on her alleged consensual romantic relationship with Hayes and (2) that he received an unfavorable job assessment because he chose to defend himself against the untrue sex harassment charges. As to the former, it has been held, and we agree, that such proof does not establish a cause of action for gender discrimination since only one woman could qualify for the job to the exclusion of all other men and women. See DeCintio v. Westchester County Medical Center, 807 F.2d 304 (2 Cir.1986), cert. den. ___ U.S. ___, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987). As to the latter, an employer's dissatisfaction with an employee's contentiousness over disputed sex harassment charges which led to that employee's discharge is not discrimination based upon sex. It is simply a nondiscriminatory employer decision for handling a contentious employee as part of the management of its business. Cf. Kephart v. *89 Institute of Gas Technology, 630 F.2d 1217, 1223 (7 Cir.1980), cert. den. 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).[3]

III.
We now address defendant's contention that, in the qualified privilege circumstances found to exist by the trial judge, the evidence failed to establish a cause of action for libel and the trial judge accordingly should have granted defendant's motion for judgment notwithstanding the verdict. The contention requires focus on the order and nature of proof when an individual in his private (as opposed to public) capacity claims to be aggrieved by a defamatory publication the alleged defamer establishes was made under qualified privilege. Resolution of the matter is governed by the prescriptions of our opinion in Bainhauer v. Manoukian, 215 N.J. Super. 9 (App.Div. 1987).
As Bainhauer points out, defendant must first establish the existence of qualified privilege circumstances. Id. at 34. Then, the trial judge, as a matter of law, must rule on the existence of the privilege. Id. at 40-41. Once the trial judge so determines, it is the plaintiff's burden to establish the defendant's conduct abused the privilege. Id. at 42; cf. Dairy Stores, Inc. v. Sentinel Pub. Co., 104 N.J. 125, 136 (1986); see also W.P. Keeton, D. Dobbs, R. Keeton & D. Owens, Prosser and Keeton on the Law of Torts, § 115 at 835 (5 ed. 1984). In such a setting, it is defendant's abuse of the privilege upon which its liability is *90 predicated. 3 Restatement, Torts 2d, Defamation, § 599 at 286 (1976).
There is no dispute the qualified privilege applied. The trial judge so found; a determination in which we concur. See Restatement, supra, §§ 593-596 at 261-277.
Defendant argues plaintiff failed to establish the predicate abuse of privilege. It asserts this principally on the ground that the evidence is devoid of any proof of actual malice. Malice, however, has been found by our Supreme Court to add "nothing to the legal analysis of an allegedly defamatory statement." Dairy Stores, Inc. v. Sentinel Pub. Co., supra, 104 N.J. at 151. Indeed, in Bainhauer, this court found much more reliable, as a basis for accepting an abuse of the qualified privilege, the criteria enunciated in the Restatement. In Bainhauer, we stated:
In essence, the Restatement formulates four discrete alternative circumstances under which the privilege may be abused. The first of these, as stated by § 600, goes to the speaker's knowledge of the falsity of the defamatory matter and adopts the New York Times rule. [New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).] Thus, the privilege is lost if the speaker either knows the matter is false or acts in reckless disregard of its falsity.... Even if the New York Times rule has not been met, the speaker, as has long been recognized by our case law, can still otherwise abuse the privilege. He will abuse it `if he does not act for the purpose of protecting the interest for the protection of which the privilege is given.' Restatement, supra, § 603 at 291. [Citation omitted]. He will abuse it by excessive publication, that is, by publishing defamatory matter without a reasonable belief `that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged.' Restatement, supra, § 604 at 292. [Citation omitted]. Finally, he will abuse it `if he does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given.' Restatement, supra, § 605 at 295. [Citation omitted]. [215 N.J. Super. at 42-43].
Guided by the tenets of Bainhauer, we review the record for evidence of defendant's abuse of the qualified privilege. Kyte received two unsolicited letters from prospective employers of the plaintiff. The first, in relevant part, read:
Dear Angela, the above mentioned individual has applied to this agency for a position as Account Executive. The job entails a general knowledge of all lines of insurance along with general abilities to deal with the public and a strong *91 organizational ability. Please advise if your firm would recommend [plaintiff] for such a position. Also, please verify for me the starting and release date of his employment along with the reason he was released.
The second letter, in relevant part, read:
Dear Ms. Kyte, [plaintiff], a former employee in your office, has applied for a position in our agency as Account Executive. I would appreciate any information you may provide as far as his past history and performance with your company.
Kyte's responses were almost identical. After identifying plaintiff's term of employment with defendant, Kyte wrote:
[Plaintiff] left our operation because his level of expertise and areas of interest in insurance did not match the depth required for the proper service of Marsh & McLennan clients.
She then noted plaintiff did possess a general knowledge of commercial insurance and was well known among insurance markets. In one of the letters she added if the correspondent sought the qualifications noted, she would recommend plaintiff.
Kyte testified her purposes in responding to the requests was that she believed if she failed to do so it would create a negative impression. She also testified she gave the real reason for plaintiff leaving and gave some positive information based on her observations so the recipients could make their own fair evaluation. She tried to make the responses non-committal and not negative thereby avoiding references to his firing.
We conclude the evidence reflects no implication of the factors cognizable for finding abuse of privilege under §§ 600, 603, 604 and 605 of the Restatement. Kyte gave her honest, professional opinion in a manner consistent with the interest of the prospective employers. There is no suggestion of any knowledge of falsity nor of a reckless disregard as to truth or falsity. Her positive reference to plaintiff's skills fostered clear support for the genuine sincerity of her opinion. She did not solicit the inquiries or publish her statement beyond her responses to the prospective employers. Plaintiff simply did not establish abuse of the privilege. See Restatement, supra, § 599 at 286-288. In so holding, we note the question of *92 motivation for the alleged defamatory statement is normally reserved for the jury since it deals with the abuse of privilege. Bainhauer v. Manoukian, supra, 215 N.J. Super. at 40. Here, however, there can be no dispute that plaintiff's only proof of wrongful motivation went to the issue of his discharge and did not have any logical carryover to Kyte's letters.
We therefore reverse and vacate the entire judgment and order entry of judgment in favor of defendant on all claims.
NOTES
[1] Plaintiff's complaint had separate counts for wrongful discharge due to a violation of public policy and sex discrimination in violation of the NJLAD. Since the wrongful discharge claim relied entirely upon the public policy against gender discrimination, we treat the counts as a single claim.
[2] This criterion may be subject to modification, however, if plaintiff demonstrates that after seeking a woman for the job, the employer hired a man in an attempt to avoid a sex discrimination claim.
[3] We comment briefly on the jury instructions and jury interrogatories. Both placed undue emphasis on the sexual harassment issue. The critical issue in the case was not sexual harassment but intentional sex discrimination. To the extent that wrongful emphasis occurred, it had the import of misleading the jury and denying defendant a fair trial. See State v. Green, 86 N.J. 281, 287 (1981). Moreover, the jury instructions, to an extensive degree, failed to provide the principles of law which governed the issues, as those principles are enunciated in Peper, Goodman, Andersen, McDonnell Douglas and its progeny, and the NJLAD. Had we concluded there was sufficient evidence to justify submitting the case to a jury, we would have reversed on the failure of the charge to meet the tenets of State v. Green, supra, at 288. Of noteworthy significance in that regard is N.J.S.A. 10:5-2.1.