**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1868-23

ANNA K. D'ANTONIO,
DONNA M. STRIDACCHIO,
and MARIO PELUSO,

      Plaintiffs-Respondents,

v.

THE NEWARK PUBLIC
SCHOOLS, NEWARK SCHOOL
DISTRICT,

      Defendant-Appellant.

_____

Submitted January 28, 2025 – Decided April 15, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6132-15.

Adams Lattiboudere Croot & Herman, LLC, attorneys for appellant (Perry L. Lattiboudere and Cherie L. Adams, of counsel and on the briefs).

Niedweske Law Firm, LLC, and Barber Law, LLC, attorneys for respondents (Jessica L. Mariconda, Linda J. Niedweske, and Kevin E. Barber, on the brief).

PER CURIAM

Plaintiffs Anna D'Antonio and Donna Stridacchio sued defendant Newark Public Schools (defendant or the District), alleging that they were not promoted to vice principals because of age and race discrimination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. A jury found that both plaintiffs had been discriminated against based on their age and race and awarded each plaintiff economic damages, as well as punitive damages. Thereafter, the trial court awarded plaintiffs attorneys' fees.

The District appeals from the final judgment, as well as several pre- and post-verdict orders. The District contends that the trial court erred in: (1) not severing plaintiffs' claims; (2) denying its motion for summary judgment; (3) denying its motion for a new trial; (4) not vacating the punitive damage awards; and (5) awarding plaintiffs attorneys' fees. Having reviewed the record and law, we reject all the District's arguments except for the contention concerning the awards of punitive damages. We, therefore, affirm the final judgment, except for the awards of punitive damages, which we vacate. We also affirm the orders denying the District's motions to sever the claims, for summary judgment, and for a new trial.

A-1868-23

I.

Plaintiffs are White women who are former employees of the District. D'Antonio began working as a teacher in 1986 and worked for the District from 2002 until 2017. During the time that she worked for the District, she held various teaching and administrative positions. In 2005, D'Antonio received her master's degree. She also obtained instructional certificates with endorsements to teach health, physical education, special education, driver's education, as well as administrative certificates allowing her to act as a supervisor, principal, and school administrator.

In 2009, D'Antonio became the chairperson of health/physical education, world languages, special education, and career and technical education program (CTE) at Weequahic High School. She held that position until 2013.

Stridacchio worked for the District from 1982 until 2014. She began her career as a math teacher and obtained an instructional certificate with an endorsement in mathematics and an administrative certificate allowing her to act as a principal and supervisor. From 2005 until 2013, Stridacchio was the chairperson of mathematics, first at Barringer Success Academy, and then at Barringer High School.

A-1868-23

In 2013, the District eliminated all department chair positions in high schools throughout the District. The District also created a smaller number of vice principal positions. Employees holding the eliminated department chair positions, as well as other candidates, were invited to apply for the vice principal positions.

The principal at each high school had the authority to select the vice principals at their schools. Between March and August 2013, 169 individuals applied for the open vice principal positions in the District. Ultimately, by August 2013, seventy-nine people were hired for vice principal positions. Of the vice principals hired in 2013, forty-three were Black, twenty-nine were White, six were Hispanic, and one was Asian. The youngest person hired as a vice principal was thirty years old, and the oldest person hired was sixty-eight years old.

D'Antonio applied for various positions throughout the District, including two vice principal positions at Weequahic High School. At that time, she was fifty-nine years of age.

D'Antonio was not hired as a vice principal at Weequahic High School. Instead, seven other people were hired as vice principals at that school. The people hired included Elizabeth Aranjo and Troy Long. Aranjo was then a forty-

nine-year-old Hispanic woman, and she was hired as the vice principal of athletics. Long was then a thirty-nine-year-old Black man, and he was hired as the vice principal of culture and climate.

After she did not get a position as a vice principal, D'Antonio took a position as a teacher at a lower salary. In February 2015, she left the District to become an assistant principal in another school district. Shortly thereafter, in October 2015, she returned to the District in a special-education role. She then retired in 2017.

Stridacchio applied for vice principal positions at two different District high schools: University High School and Barringer High School. In 2013, when she submitted those applications, Stridacchio was fifty-six years old.

Stridacchio was not hired as a vice principal. Stridacchio acknowledged that she froze at the interview for the vice principal position at University High School. The vice principal positions at Barringer High School were filled by several different people, including Natica Mills and John Gonzalez. Mills was a thirty-year-old Black woman, who had previously been a science teacher. Gonzalez was a Hispanic man who was thirty-five-years-old. He had previously been a special needs teacher and vice principal in another school district.

 A-1868-23

After Stridacchio was not hired as a vice principal, she was given a position as a math teacher at an elementary school. She testified that she wanted to stay employed until 2022, but due to stress and humiliation following her return to a teaching position, she retired effective July 1, 2014.

In August 2015, plaintiffs sued the District, alleging unlawful discrimination based on their age and race in violation of LAD. Defendants moved to sever the claims of each plaintiff. The trial court denied that motion in an order entered on November 6, 2015.[1] Thereafter, plaintiffs amended their complaint twice and added claims for fraudulent concealment and allegations that the District had failed to preserve relevant documents.

In 2020, the District moved for summary judgment, contending that plaintiffs had failed to establish a prima facie case of discrimination. The trial court denied that motion in an order entered on March 13, 2020. The court found that there were disputed issues of material fact concerning plaintiffs' claims and, therefore, the District was not entitled to summary judgment.

The District then moved for reconsideration, which the trial court granted in part and denied in part. In an order dated April 24, 2020, the trial court

---

[1] A third plaintiff, Mario Peluso, had also sued the District. In 2023, however, he dismissed all his claims. Neither Peluso nor his claims are involved in this appeal.

A-1868-23

dismissed plaintiffs' claims of fraudulent concealment, pattern and practice, and disparate impact. The court held that plaintiffs had failed to file a timely tort claim notice concerning the fraudulent concealment claim. The court also reasoned that plaintiffs' claims of pattern and practice and disparate impact were not legally cognizable or properly pled.

Plaintiffs' remaining claims of age and race discrimination in violation of LAD were tried before a jury. At trial, D'Antonio and Stridacchio both testified. They each explained the vice principal positions they had applied for in 2013 and their qualifications for those positions. They also testified to the qualifications of the people who were hired for those positions and contended that they were better qualified than several of them.

The District called various witnesses, including the principals of Weequahic High School and Barringer High School. Those principals testified that they had interviewed numerous people for the vice principal positions at their respective schools. They also detailed the reasons they had hired the people who were selected as vice principals.

Faheem Ellis, the principal of Weequahic High School, explained why he had hired Aranjo and Long as vice principals. Ellis testified he had known Aranjo for approximately ten years and that they had previously worked

A-1868-23

together. Ellis had a chance encounter with Aranjo and she informed him that her position had recently been eliminated. He stated that he recommended Aranjo for the vice principal position based on her "experience" and "leadership qualities." He acknowledged that Aranjo, unlike other candidates, did not sit through the twenty-minute video or meet with other team members. He also acknowledged that Aranjo was "Spanish," but stated that he did not know her age. Aranjo was forty-nine years old in 2013, when she was hired as vice principal.

Concerning Long, Ellis explained that he had known Long and believed that he had "the right background and temperament" for the vice principal position. In 2013, Long was a thirty-nine-year-old Black man.

Wayne Dennis, the principal of Barringer High School, could not recall interviewing Stridacchio, but he also acknowledged that he might have interviewed her. Dennis recalled that administrators were given a list of questions and a template to use when interviewing vice principal candidates. He explained that there was no express policy to give preference to one race over another, but he also stated that he thought it was important for vice principals to connect with the community and that Barringer High School had many Hispanic students, a fair number of Black students, and a very small number of White

8

students.  Dennis recalled that in making hiring decisions, "we wanted diversity, but at the same time we wanted the best person from the pool.  So the race really wasn't a driving factor in the decision."

Concerning Gonzalez, Dennis testified that one of the reasons he hired Gonzalez was because he was a Hispanic man.  In that regard, Dennis explained that he selected Gonzalez because he was bilingual, and he wanted "[s]omeone that could speak Spanish.  Someone that could help us translate, and he was able to do some of those things for us."

Regarding Mills, Dennis recalled first meeting her when he went to Barringer High School.  He explained that Mills had a background in science, and he acknowledged that she had no administrative experience.  He denied that Mills' race had anything to do with his decision to hire her as vice principal, but he also acknowledged that he knew she was Black.

At trial, plaintiffs called James DiGabriele, a forensic accountant, to testify concerning their lost earnings and pension benefits.  DiGabriele was qualified as an expert witness in forensic accounting.  He calculated D'Antonio's total economic loss as $417,930, based on a loss of earnings and pension.

DiGabriele calculated Stridacchio's economic losses to be $608,574.  That calculation was based on Stridacchio's planned retirement date of July 31, 2022,

and accounted for the income she had earned and the Social Security benefits she received after she applied for disability assistance.

After hearing all the testimony and considering the evidence admitted at trial, the jury found that both D'Antonio and Stridacchio had been subjected to discrimination based on their age "and/or" race. The jury awarded D'Antonio $417,930 in economic damages, and $200,000 in compensatory damages for pain and suffering. The jury awarded Stridacchio $608,574 in economic damages. Finally, the jury awarded both plaintiffs $100,000 in punitive damages.

Following the jury verdict, plaintiffs submitted applications for counsel fees. After analyzing the supporting certifications, the trial court awarded $1,642,712.64 in attorneys' fees to plaintiffs. In making that award, the court found that plaintiffs' counsel's hourly rates were reasonable, and the court granted a lodestar enhancement of twenty-five percent.

On January 19, 2024, the court entered a final judgment awarding the damages found by the jury and the attorneys' fees. The court also awarded pre-judgment interest to each plaintiff. At the same time, the trial court denied the District's application to vacate, reduce, or remit the damages.

Thereafter, defendants moved for a new trial or, in the alternative, remittitur. On April 14, 2023, the trial court denied both those motions.

The District now appeals from the January 1, 2024 final judgment; the November 5, 2015 order denying the District's motion to sever plaintiffs' claims; the March 13, 2020 order denying its motion for summary judgment; the April 14, 2023 order denying its motion for a new trial; and the December 14, 2023 order awarding attorneys' fees and costs to plaintiffs.

II.

On appeal, the District challenges the final judgment and the orders on multiple grounds. It contends that plaintiffs' claims should have been severed. The District also argues that the trial court should have granted summary judgment to it because plaintiffs failed to make a prima facie showing of discrimination. The District then makes a series of arguments as to why the trial court erred in not granting it a new trial, including that the awards of punitive damages were "unjust." Finally, the District asserts that the attorneys' fees awarded to plaintiffs were abuses of discretion.

A. The Motion to Sever.

A motion for severance is governed by Rule 4:29 and 4:38. Lanzo v. Cyprus Amax Minerals Co., 467 N.J. Super. 476, 529 (App. Div. 2021). Rule

11

4:29-1(a) authorizes the joinder of claims asserted by multiple parties and provides in relevant part:

> All persons may join in one action as plaintiffs or be joined as defendants jointly, severally, in the alternative, or otherwise, if the right to relief asserted by the plaintiffs or against the defendants arises out of or in respect of the same transaction, occurrence, or series of transactions or occurrences and involves any question of law or fact common to all of them.

Rule 4:38-2(a) allows a court to order a separate trial of any claim "for the convenience of the parties or to avoid prejudice." The decision to deny or grant a motion to sever is vested in the discretion of the trial court. Rendine v. Pantzer, 141 N.J. 292, 310 (1995); Wacker-Ciocco v. Gov't Emps. Ins. Co., 439 N.J. Super. 603, 610-11 (App. Div. 2015).

In Rendine, the New Jersey Supreme Court noted that "a number of federal courts have ruled that testimony by employees about discriminatory actions by the defendant-employer similar to those alleged by the plaintiff is admissible to prove the employer's motive or intent to discriminate." 141 N.J. at 309. The Court then discerned no abuse of discretion in the trial court's determination to deny severance where two former female employees brought claims of discrimination based on LAD. Id. at 310-11.

A-1868-23

Plaintiffs contend that severance was not appropriate because their failures to obtain positions as vice principals arose out of "the same transactions [or] occurrence," the District's decision to eliminate all department chair positions. See R. 4:29-1(a). In contrast, the District argues that the claims asserted by D'Antonio and Stridacchio should have been severed because they were based on decisions made by different decision-makers. The District also contends that the evidence introduced by each plaintiff would not have been admissible in a separate trial involving the other.

Having reviewed the record, we discern no reversible abuse of discretion in the trial court's determination to deny severance. The jury considered each plaintiff's claims separately and made separate findings and awards of damages. Moreover, the District has not demonstrated any prejudice from the joinder of plaintiffs' claims in one trial.

B.    The Motion for Summary Judgment.

We review a grant or denial of summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

13

challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

"[A]ppellate review of the grant [or denial] of summary judgment is limited to the record that existed before the motion judge." E.S. ex rel. G.S. v. Brunswick Inv. Ltd. P'ship, 469 N.J. Super. 279, 286 (App. Div. 2021). See Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 (1963); Lebron v. Sanchez, 407 N.J. Super. 204, 213 (App. Div. 2009). We do not defer to the trial court's legal analysis or statutory interpretation. See RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

While applying this standard of review in this matter, we do not ignore the facts and evidence presented at trial. Instead, because the claims proceeded to trial, we logically assume that all the evidence presented at trial was available when the District moved for summary judgment.

"The 'overarching goal of the [LAD] is nothing less than the eradication "of the cancer of discrimination."'" Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446 (2005) (alteration in original) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). In that regard, "the LAD 'unequivocally expresses a legislative intent to prohibit discrimination in all aspects of the employment relationship, including hiring and firing, compensation, the terms and conditions of employment, and retirement.'" Alexander v. Seton Hall Univ., 204 N.J. 219, 227-28 (2010) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 106-07 (2010)). "Because of its remedial purpose, the LAD should be construed liberally to achieve its aims." Zive, 182 N.J. at 446.

Under the LAD, "there is no single prima facie case that applies to all discrimination claims. Instead, the prima facie elements of a claim vary depending upon the particular employment discrimination claim being made." Victor v. State, 203 N.J. 383, 409-10 (2010).

To establish a claim of age discrimination under the LAD, "an employee must 'show that the prohibited consideration[, age,] played a role in the decision making process and that it had a determinative influence on the outcome of that process.'" Bergen Com. Bank v. Sisler, 157 N.J. 188, 207 (1999) (alteration in original) (quoting Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 344

15

(App. Div. 1997)); <u>Garnes v. Passaic Cnty.</u>, 437 N.J. Super. 520, 537 (App. Div. 2014).

To establish a claim of race discrimination under the LAD, a plaintiff must demonstrate:

> that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified [or less-qualified] person.
>
> [<u>Gerety v. Atl. City Hilton Casino Resort</u>, 184 N.J. 391, 399 (2005) (citing <u>Andersen v. Exxon Co.</u>, 89 N.J. 483, 492 (1982)).]

Where there is no direct evidence of discrimination and the claim is supported by circumstantial evidence, the evidence is assessed under the <u>McDonnell Douglas</u> framework. <u>Sisler</u>, 157 N.J. at 209 (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). Under that framework, if a plaintiff establishes a prima facie case, a presumption of unlawful discrimination arises. <u>Id.</u> at 210. The employer can then try to rebut the presumption "with admissible evidence of a legitimate, non-discriminatory reason" for taking the employment action at issue. <u>Ibid.</u> At that point, "the presumption of discrimination disappears" and the burden shifts back to the employee "to prove by a preponderance of the evidence that the legitimate

A-1868-23

nondiscriminatory reason articulated by the [employer] was not the true reason for the employment decision but was merely a pretext for discrimination." Id. at 211 (quoting Andersen, 89 N.J. at 493) (internal quotation marks omitted).

In reverse discrimination cases, where the plaintiff is a member of a group "that has not historically been victimized by discrimination," the first prong of the McDonnell Douglas framework requires the plaintiff to "substantiate . . . that the 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" Erickson v. Marsh & McLennan Co., 117 N.J. 539, 551-52 (1990) (omission in original) (quoting Erickson v. Marsh & McLennan Co., 227 N.J. Super. 78, 87 (App. Div. 1988)). "An employee can demonstrate 'background circumstances' sufficient to raise an inference of discrimination" in one of two ways. Sisler, 157 N.J. at 214 (quoting Murphy v. Milwaukee Area Tech. Coll., 976 F. Supp. 1212, 1217 (E.D. Wis. 1997)).

The first is "by establishing . . . that the plaintiff was better qualified for the position than the minority candidate selected." Ibid. "A rational employer can be expected to promote the more[-]qualified applicant over the less[-]qualified [applicant], because it is in the employer's best interest to do so." Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993). "When an employer acts

17

contrary to its best interests, then it is proper to infer a discriminatory motive." DeCapua v. Bell Atl.-N.J., Inc., 313 N.J. Super. 110, 122 (Law Div. 1998). Alternatively, the plaintiff may demonstrate "that the defendant had some reason or inclination to discriminate against the majority [group]." Sisler, 157 N.J. at 214.

The District focuses its arguments on D'Antonio's and Stridacchio's race discrimination claims. It then argues that neither plaintiff established a prima facie case of reverse discrimination. In that regard, the District contends that plaintiffs did not show that it was the "unusual employer" that discriminates against White employees.

Plaintiffs submitted evidence to the trial court, including resumes, certifications, and deposition testimony, to support an inference that they were better qualified than several candidates selected for the vice principal positions and that they were not selected because of their age or race.

Concerning D'Antonio, there was evidence that Aranjo and Long were younger than and less qualified than D'Antonio, but they both were selected as vice principals at Weequahic High School and D'Antonio was not. Plaintiffs, in opposition to summary judgment, noted that Aranjo, a younger, Hispanic woman, was not required to complete a formal interview process required of the

other Weequahic candidates and was offered the vice principal position "on the spot." They also alleged Long, a younger, Black male, received a promotion to vice principal of climate and culture even though he had less CTE experience than D'Antonio.

In Ellis' deposition, he acknowledged that Aranjo, unlike other candidates, did not sit through a formal interview or meet with other team members. He also denied knowing that D'Antonio had relevant experience, although her experience was listed on her resume at the time.

Stridacchio presented evidence that she applied for the vice principal position at Barringer High School, but that Mills and Gonzalez were given those positions even though they were both younger and less qualified. Mills was hired even though, unlike Stridacchio, she lacked administrative experience. Similarly, Gonzlez had eight years of teaching experience compared to Stridacchio's twenty-three years. Further, in a pre-trial deposition, Dennis made the following statement regarding his hiring decision:

> [Gonzalez] was Hispanic. He was male. The school was, at the time, I believe about [sixty] to [seventy] percent Hispanic, so it was important for us to have diversity. So he was part of that move to make sure we had diversity. Not just a thought, but diversity.

A-1868-23

Later, when asked "Can you tell me why it was that you picked Mr. Gonzalez to be one of your [vice principals]?", Dennis responded: "Again, he was–at the time we needed to have diversity on team–on the leadership team."

Having reviewed the evidence in the record and the applicable law, we find no basis to hold that the District was entitled to summary judgment. Giving all favorable inferences, we conclude both plaintiffs established prima facie showings of race and age discrimination under the LAD. Plaintiffs presented evidence that they were older and better qualified than some of the people selected as vice principals. Considering that evidence, a reasonable jury could find that both plaintiffs had been subject to race discrimination because they were better qualified than people of different races who were selected over them. So, we discern no error in the trial court's decision to deny summary judgment and we affirm the order denying the District's motion for summary judgment.

C.     The Motion for A New Trial.

Following the jury verdict, the District moved for a new trial. That motion was denied, and the District now contends: (1) plaintiffs failed to establish a prima facie showing of discrimination and, thus, the burden should never have shifted to the District to show that the people who were hired as vice principals were hired for non-discriminatory reasons; (2) the verdict was against the weight

A-1868-23

of the evidence; (3) the jury charge was deficient because it failed to explain the "unique aspects of reverse discrimination;" (4) the trial court improperly instructed the jury regarding direct evidence of discrimination against Stridacchio; (5) the trial court improperly allowed evidence of a 2015 negative evaluation of Aranjo; (6) plaintiffs' counsel made improper prejudicial comments; (7) the damages awarded to plaintiffs were against the weight of the evidence; and (8) the punitive damage award was unjust.

A party is entitled to a new trial following a jury verdict only if that party shows that "there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)) (internal quotation marks omitted). A miscarriage of justice occurs when "there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Ibid. (quoting Risko, 206 N.J. at 521-22).

An appellate court uses that same standard in evaluating an appeal from the denial of a motion for a new trial. Ibid. In that regard, Rule 2:10-1 states that a trial court's ruling on a motion for a new trial "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."

Moreover, an appellate court must give "'due deference' to the trial court's 'feel of the case.'" Risko, 206 N.J. at 522. In short, to be overturned, a jury's "verdict must shock the judicial conscience." Caldwell v. Haynes, 136 N.J. 422, 432 (1994) (citing Carey v. Lovett, 132 N.J. 44, 66 (1993)).

1.      The Shifting of the Burden and the Weight of the Evidence.

The District's first two arguments fail for the same reasons that we have already analyzed in affirming the denial of the motion for summary judgment. In short, both plaintiffs presented evidence of a prima facie case of age and race discrimination. Accordingly, the burden properly shifted to the District to demonstrate that they hired people who were younger and of a different race than plaintiffs without any discriminatory reason. See Meade v. Twp. of Livingston, 249 N.J. 310, 329 (2021). The District contends that the testimony it presented, and in particular the testimony of Ellis and Dennis, showed that there were legitimate reasons for hiring the individuals who were selected as vice principals. The jury, however, did not accept the District's evidence and the verdict demonstrates that the jury found the District's explanation to be pretextual.

On the verdict sheet completed by the jury, the jury was expressly asked whether each plaintiff proved that "she had applied for and interviewed and was

better qualified than the candidates selected" for the vice principal positions. Regarding D'Antonio, the jury found that she was better qualified than some of the candidates selected over her for the Weequahic High School vice principal positions. Regarding Stridacchio, the jury found that she was better qualified than some of the candidates selected over her for the Barringer High School vice principal positions.

The jury also found that both D'Antonio and Stridacchio had proven that each of them were not selected for the vice principal positions "because of her age and/or race." In other words, the jury found that both plaintiffs had been discriminated against based on their ages, as well as their race. It was the role of the jury to determine whether that evidence convinced it that age and race discrimination played a role in those decisions. Given that there was sufficient evidence from which the jury could reach those determinations, there is no basis for us to reverse the jury verdict.

2.    The Jury Charge on Discrimination.

The District contends that the jury charge on discrimination was deficient because it did not sufficiently focus the jury's attention on plaintiffs' burden to establish that the District was the unusual employer who discriminated against White employees. The District, however, did not make this objection at trial.

A-1868-23

Accordingly, we review this issue for plain error. See State v. Torres, 183 N.J. 554, 564 (2005). Plain error occurs when the error was "clearly capable of producing an unjust result." R. 2:10-2; see also R. 1:7-2 (explaining that "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict").

In employment discrimination cases, the "prima facie case and the shifting burdens confuse lawyers and judges, much less juries, who do not have the benefit of extensive study of the law on the subject." Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 471 (2000). To avoid that potential confusion, courts have held that it is not always necessary to charge the jury on the element of the burden shifting of the prima facie case of discrimination. Baker v. Nat'l State Bank, 312 N.J. Super. 268, 288 (App. Div. 1998).

The trial court in this case expressly explained to the jury that it was "the [plaintiffs'] burden to prove [it was] more likely than not [that] defendant engaged in intentional discrimination because of [plaintiffs'] race and/or age." The court also instructed the jury that it was plaintiffs' burden to "show by a preponderance of the evidence that they had superior, better qualifications for the respective vice principal positions for which they applied, interviewed[,] and

were not promoted." The verdict sheet given to the jury also reflected these instructions because it required the jury to find that each plaintiff had proven "by a preponderance of the evidence that she applied for and interviewed and was better qualified than the candidates selected for the . . . vice principal positions."

The jury instructions adequately explained plaintiffs' burden to show that they were "better qualified for the position than the minority candidate[s] selected." See Sisler, 157 N.J. at 214. Accordingly, the jury charge was sufficient and properly instructed the jury on the law. We discern no plain error or reversible error.

3.     The Jury Charge on Direct Evidence of Discrimination.

In instructing the jury concerning this case, the trial court told the jurors that they could consider "both direct and circumstantial evidence." The court then stated that "Dennis testified he took race into consideration in the [v]ice [p]rincipal selection process," and that as a result, the burden was on the District to show "by a preponderance of the evidence that it would have made the same promotion decision[] . . . if the illegal race bias had played no role" in its decision regarding Stridacchio. The District now argues that this "direct evidence charge" constituted plain error.

Direct evidence in a discrimination case can be a "statement made by a decision[-]maker associated with the decision[-]making process [which] actually bore on the employment decision at issue." McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 528 (2003) (citing Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002)). That type of evidence must "demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." Sisler, 157 N.J. at 208 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).

If an employee can show that an impermissible factor substantially contributed to "an adverse employment decision, the burden then shifts to the employer to show it would have made the same decision even in the absence of the impermissible consideration." Id. at 209 (citing Price Waterhouse, 490 U.S. at 242). This gives the employer a higher burden of production, since direct evidence of discrimination "destroys 'the same presumption of good faith concerning its employment decisions which is accorded employers facing only circumstantial evidence of discrimination.'" Ibid. (quoting Price Waterhouse, 490 U.S. at 265-66 (O'Connor, J., concurring)).

At trial, Dennis was cross-examined on his hiring decision concerning Gonzalez. He admitted that "one of the reasons [he] chose . . . Gonzalez was [because] he was [a] Hispanic male," and that he had taken "race into consideration when [he] selected candidates for the [v]ice [p]rincipal position." Dennis also agreed that he "selected other candidates based upon their race to reflect the student body at Barringer [High School]." These statements were made by Dennis, who was involved in the decision-making process of the employment decision at issue. Accordingly, a reasonable jury could find that Dennis' testimony constituted direct evidence of an impermissible consideration of race.

The District, however, argues that the direct evidence charge was given in error because the trial court failed to distinguish between bias and preference. Specifically, it contends that "[t]he fact that Dennis was influenced [by race] . . . was not a proper basis" for the charge because there was no evidence "that Dennis allowed bias or animus" against White employees to influence his hiring decision. While Dennis' testimony could have been found to be non-discriminatory, that decision was up to the jury. The jury here apparently did not accept Dennis' explanation.

27

In McDevitt, the Supreme Court of New Jersey found that an employer's head nod in response to a comment that an employee was "too old" could be direct evidence sufficient to shift the burden of persuasion from the plaintiff to the defendant.  175 N.J. at 531-32.  The facts of McDevitt do not reveal that the employer had a strong bias against nor animus towards the elderly, but rather that the employer impermissibly relied on a protected characteristic when making an employment decision.  Id. at 523-32.  The same reasoning applies in this case.  Therefore, the jury charge on direct evidence of discrimination did not amount to reversible error.

4.      The Admission of a Negative Evaluation of Aranjo.

The District contends that plaintiffs were improperly allowed to read to the jury a 2015 negative evaluation of Aranjo's performance as vice principal. Plaintiffs argue that the performance evaluation was relevant and supported their claim that Aranjo was not as well-qualified as D'Antonio.

Appellate courts defer to the trial court's evidentiary rulings absent an abuse of discretion because "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion."  State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).

The document at issue here is Aranjo's 2015 performance evaluation while she was serving as vice principal, approximately two years after she initially was appointed to that position. Ellis testified that the evaluation was "inconsistent" with his recollection of her performance while she was at the school. The evaluation was used by plaintiffs' counsel to try to undermine Ellis' use of Aranjo's qualifications in comparison to D'Antonio's qualifications.

We have previously allowed evidence concerning job performance that had been created after a plaintiff's wrongful termination, even though the employer "could not have considered events that had not yet occurred when they decided to terminate plaintiffs." Baker, 312 N.J. Super at 295. In Baker, we reasoned that the evidence was relevant because "proof that [the employer's] decision was 'terribly bad' might impair their credibility and form the basis for an inference that they intended to discriminate." Id. at 295-96.

Like in Baker, the evaluation that showed Aranjo's "poor performance" was "part of plaintiffs' proof that [D'Antonio was] better qualified." See id. at 296. Consequently, we discern no abuse of discretion in allowing questions regarding Aranjo's 2015 performance evaluation. We also note that the use of the evaluation was a small part of the evidence presented by plaintiffs.

Therefore, considered in full context, the limited questioning concerning that evaluation does not constitute reversible error.

5.      Comments Made by Plaintiffs' Counsel.

The District argues that plaintiffs' counsel made intentional misrepresentations, repeated false innuendos, and made numerous disparaging remarks concerning the District's witnesses.  The trial court rejected these arguments, and we discern no grounds for reversing on this issue.

In considering the District's motion for a new trial, the trial court assessed most of the "disparaging comments" made by plaintiffs' counsel.  The trial court found these comments to be fair and noted that the District had not objected to many of them. The trial court also reviewed the cross-examination of certain witnesses and found that the questions "impeached their credibility regarding the certifications and the inconsistencies," and therefore, that they were also fair.

Having reviewed the comments now identified by the District, we discern no reversible error in the trial court's decision not to grant a new trial.  The District argues that, in the opening statement, plaintiffs' counsel improperly: (1) told the jury that Ellis' consideration of race was direct evidence of discrimination; (2) alleged Ellis engaged in a cover-up by falsifying Aranjo's job title, and (3) suggested that Stridacchio retired due to the stress and

humiliation of being demoted. The District also alleges that plaintiffs' counsel made false and misleading statements during trial concerning the qualifications of those hired for the vice principal positions. Finally, the District contends that the focus of plaintiffs' closing argument was to "divert attention from the factual evidence" and "encourage the jury to view the District . . . as conspiring to cover up District-wide discrimination."

"The trial court has broad discretion in the conduct of the trial, including the scope of counsel's summation." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 392 (2009). A trial court oversees a trial within its discretion, "including cross-examination and the appropriate limits thereon," and that discretion will be reversed only if "there is a clear abuse of discretion which has deprived [a party] of a fair trial." Daisey v. Keene Corp., 268 N.J. Super. 325, 334 (App. Div. 1993) (citing Janus v. Hackensack Hosp., 131 N.J. Super. 535, 540-41 (App. Div. 1974)).

Here, we discern no abuse of discretion concerning the trial court's oversight of the trial and the statements and arguments made by counsel. The comments made by plaintiffs' counsel during the opening statement were designed to "inform the jury in a general way of the nature of the action and the basic factual hypothesis projected." Szczecina v. PV Holding Corp., 414 N.J.

31

Super. 173, 178 (App. Div. 2010) (quoting Amaru v. Stratton, 209 N.J. Super. 1, 15 (App. Div. 1985)) (internal quotation marks omitted). The questions asked on cross-examination were designed to attack the credibility of the witnesses. Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (citing N.J.R.E. 611(b)). And lastly, the remarks made during closing argument did not "transgress[] the boundaries of the broad latitude . . . afforded to counsel." Bender v. Adelson, 187 N.J. 411, 431 (2006). Accordingly, viewed in context, the statements do not constitute reversible error.

6.    The Compensatory Damage Awards.

In reviewing the damages awarded by a jury, the record should be viewed in the light most favorable to the plaintiffs. Cuevas v. Wentworth Grp., 226 N.J. 480, 488 (2016) (citing Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 577 (2010)). "[T]he trial court may not disturb a damage[] award entered by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.'" Orientale v. Jennings, 239 N.J. 569, 595-96 (2019) (quoting Cuevas, 226 N.J. at 485). We review a damage award using that same standard, except we accord some deference to the trial court's "feel of the case." Cuevas, 226 N.J. at 501 (citing Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)).

Plaintiffs both testified as to the impact on them after they were not promoted to vice principals. Plaintiffs also presented expert testimony from a qualified forensic accountant setting forth their economic damages. The jury apparently accepted the expert's testimony because it awarded each plaintiff the amount of economic damage identified by the expert.

Defendants now argue that the economic damages awards were against the weight of the evidence. Concerning D'Antonio, the District argues that she retired early, and her back pay damages should have been cut off because she took a job at another district in 2015. Regarding Stridacchio's damage award, the District claims that the calculation improperly assumed that she would retire in 2022, when she actually retired in 2014. In response, plaintiffs point out that Stridacchio testified that she "was forced to retire."

The jury's award of compensatory damages was consistent with plaintiffs' expert's calculations based on each plaintiff's alleged losses. Accordingly, the awards were supported by evidence and the amounts awarded do not shock our judicial conscience. We, therefore, discern no basis to vacate those compensatory damage awards.

A-1868-23

7. The Punitive Damage Award.

The District contends that the award of punitive damages was unwarranted "because there [was] no basis in the record to find that anyone in the District engaged in egregious or outrageous acts of discrimination." The record supports that argument.

"[P]unitive damages are only to be awarded in exceptional cases even where the LAD has been violated." Pritchett v. State, 477 N.J. Super. 597, 611 (App. Div. 2024) (alteration in original) (quoting Saffos v. Avaya Inc., 419 N.J. Super. 244, 263 (App. Div. 2011)) (internal quotation marks omitted). "To be exceptional, the defendant's conduct must 'ris[e] to [a] level of wanton or reckless conduct.'" Ibid. (first alteration in original) (quoting Saffos, 419 N.J. Super. at 263).

Punitive damages in a LAD case are subject to New Jersey's Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17. Saffos, 419 N.J. Super. at 262. The PDA requires juries to consider four factors before awarding punitive damages:

> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
>
> (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

34

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

[Ibid. (quoting N.J.S.A. 2A:15-5.12(b)).]

The PDA further mandates that, "[b]efore entering judgment for an award of punitive damages, the trial judge shall ascertain [whether] the award is reasonable in its amount and justified in the circumstances of the case." N.J.S.A. 2A:15-5.14(a). If the trial judge determines that the award is unreasonable, he or she "must reduce or eliminate the award." Saffos, 419 N.J. Super. at 263 (quoting N.J.S.A. 2A:15-5.14(a)).

Moreover, the award of punitive damages must be given "special consideration . . . in cases involving public entities." Pritchett, 477 N.J. Super. at 612. Indeed, the Supreme Court of New Jersey has recognized that "in the case of a governmental entity, when public monies are the source of the award, the judge must scrutinize with great care the amount of the award." Lockley v. State of N.J. Dep't of Corr., 177 N.J. 413, 433 (2003). The trial judge's decision under N.J.S.A. 2A:15-5.14(a) is reviewed for an abuse of discretion. Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 565 (App. Div. 2007), aff'd, 194 N.J. 212 (2008).

A-1868-23

"Our case law has established two distinct conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under the LAD." Rendine, 141 N.J. at 313 (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 626 (1993)). "Those two requirements are (1) 'actual participation in or willful indifference to the wrongful conduct on the part of upper management' and (2) 'proof that the offending conduct [is] especially egregious.'" Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113 (1999) (alteration in original) (quoting Rendine, 141 N.J. at 314).

In this case we need not determine if Ellis and Dennis were upper management in the District because there was insufficient evidence of especially egregious conduct to support the jury's awards of punitive damages. To establish egregiousness a plaintiff must prove "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]." Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 274 (2010) (alteration in original) (quoting Rendine, 141 N.J. at 314). "In the alternative, . . . the evidence will suffice if it demonstrates that defendant acted with 'actual malice.'" Ibid. (quoting Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337 (1993)).

Here, there was no evidence to show that the District, in not making plaintiffs vice principals, acted with "a wanton and willful disregard for the rights of [plaintiffs]" or "actual malice." Dennis explained that his hiring decision was not based on malice towards White employees but on the goal of "diversity." Ellis explained that he did not hire D'Antonio, not because of any ill-will towards her race, but because he thought she did not have the right temperament for the position. Even assuming the jury did not accept that testimony, there was no evidence that the District's actions were the result of malice towards plaintiffs based on their ages or race.

Punitive damages against the District, which is a public entity funded by public monies, should have been reviewed with a heightened standard, and should have been scrutinized more carefully. See Lockley, 177 N.J. at 433. Under that heightened scrutiny, the record contains insufficient evidence to support the award of punitive damages.

D. The Award of Counsel Fees.

We review an award of attorneys' fees for an abuse of discretion. Empower Our Neighborhoods v. Guadagno, 453 N.J. Super. 565, 579 (App. Div. 2018); Shore Orthopaedic Grp., LLC v. Equitable Life Assurance Soc'y, 397 N.J. Super. 614, 623 (App. Div. 2008). "[F]ee determinations by trial courts

will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Empower Our Neighborhoods, 453 N.J. Super. at 579 (alteration in original) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)).

"A prevailing party can recover counsel fees if expressly allowed by statute, court rule, or contract." Ibid. Relevant here, "N.J.S.A. 10:5-27.1 provides that 'the prevailing party may be awarded a reasonable attorney's fee as part of the cost.'" Tarr v. Ciasulli, 181 N.J. 70, 85 (2004).

"Courts tasked with determining the reasonableness of fees must calculate the '"lodestar," which equals the number of hours reasonably expended multiplied by a reasonable hourly rate.'" Kopec v. Moers, 470 N.J. Super. 133, 158 (App. Div. 2022) (quoting J.E.V. v. K.V., 426 N.J. Super. 475, 493-94 (App. Div. 2012)).

Pursuant to RPC 1.5(a), "[t]he factors to be considered in determining the reasonableness of a [lawyer's] fee" include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

[Id. at 157-58 (first alteration in original) (quoting RPC 1.5(a)).]

The District now challenges the trial court's award of attorneys' fees as unreasonable. Specifically, it takes issue with the fact that "[p]laintiffs requested . . . hourly rate[s] of . . . $650 for Linda Niedweske, and $500 for Jessica Mariconda," attorneys who represented plaintiffs in this matter.

The trial court here explained that it "spent an extensive amount of time analyzing [the] particular bills and the objections raised by counsel." The trial court then carefully considered all eight factors under RPC 1.5(a), and the supporting certifications submitted by experienced employment law attorneys, before calculating the lodestar and an enhancement of the lodestar.

A-1868-23

Regarding the hourly rates of Niedweske and Mariconda, a certification from Alan Schorr, Esq., which was before the trial court, stated:

15. I am professionally familiar with Ms. Niedweske and have been for a number of years.

16. I know Ms. Niedweske to be deeply knowledgeable and an expert in this area of law. . . .

17. My own hourly rate is $600[,] and I consider Ms. Niedweske to have credential[s] and experience at least similar to myself and other top employment lawyers in New Jersey. I also have personal knowledge that our most experienced and successful colleagues also charge fees of $600, and some substantially more. I find her hourly rate of $600[] based on her experience both fair and reasonable.

18. I believe the hourly rate of $500[] sought for Jessica Mariconda, Esq., and experienced employment attorney practicing [since] 2011, is also reasonable.

19. Experienced and successful attorneys, such as Linda Niedweske and Jessica Mariconda, who are willing to take on significant and risky discrimination cases should be recognized for their efforts when they obtain significant relief for their clients. On the basis of the awards and rates cited herein, it is my belief that the hourly rates requested by counsel are appropriate and reasonable and even below prevailing market rates for other practitioners in this field and community.

That certification, together with trial counsel's certifications supporting the fees awards, gave the trial court the factual basis to find that trial counsels' hourly rates were reasonable. In that regard, in its oral decision the trial court

40

repeatedly highlighted Mariconda's and Niedweske's experience in working on discrimination cases. See Walker v. Giuffre, 209 N.J. 124, 132 (2012) ("the calculation of a reasonable hourly rate . . . should include an assessment of the 'experience and skill of the prevailing party's attorneys and [a] compar[ison] . . . to the rates prevailing in the community for similar services' by comparable lawyers" (alterations in original) (quoting Rendine, 141 N.J. at 337)). To the extent that there was a discrepancy between Niedweske having an hourly rate of $600 or $650, we do not consider that discrepancy as grounds for reversing or modifying the fees award.

LAD allows attorneys' fees to support the goal of eliminating discrimination. See Hansen v. Rite Aid Corp., 253 N.J. 191, 213, reconsideration denied, 253 N.J. 552 (2023) (explaining that "the Legislature provided that in 'any action or proceeding brought' pursuant to the LAD, 'the prevailing party may be awarded a reasonable attorney's fee as part of the cost'"). A jury found that plaintiffs had proven that they had been subjected to both age and race discrimination under the LAD. The trial court properly reviewed and analyzed the fee applications. We discern no abuse of discretion in the trial court's awards of attorneys' fees and costs.

## III.

Having reviewed all the District's arguments, we conclude that there is no basis to reverse the jury awards and attorneys' fees awards, except for the punitive damage awards. Accordingly, we affirm all the orders and the final judgment challenged on this appeal, with one exception. We direct that paragraphs four and five of the final judgment, which awarded punitive damages of $50,000 to each plaintiff, be stricken. We remand and direct the trial court to enter an amended final judgment that does not include punitive damages. In all other respects, the final judgment is affirmed.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1868-23